IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

HEATHER JOY KIDD,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )      Civil Action No.: 1:16-cv-723-WC
                                     )
NANCY A. BERRYHILL,[1]               )
Acting Commissioner of Social Security,  )
                                     )
          Defendant.                 )

## MEMORANDUM OPINION

## I.     INTRODUCTION

Heather Joy Kidd ("Plaintiff") filed an application for disability and disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, on

June 13, 2013.  Her application was denied at the initial administrative level on October 3,

2013.  Plaintiff then requested and received a hearing before an Administrative Law Judge

("ALJ").  At that hearing, the ALJ determined that Plaintiff had the residual functional

capacity to perform the full range of sedentary work, and that Plaintiff had not been under

a disability, as defined by the Social Security Act, from the alleged onset date through the

date of the decision.  Plaintiff appealed the decision to the Appeals Council, but was denied

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Nancy A. Berryhill shall be substituted for Acting Commissioner Carolyn
W. Colvin as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason
of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

review on July 2, 2016. The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[2] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the court for review under 42 U.S.C. § 405(g). Pursuant to 28 U.S.C. § 636(c), both parties have consented to the conduct of all proceedings and entry of a final judgment by the undersigned United States Magistrate Judge. Pl.'s Consent to Jurisdiction (Doc. 8); Def.'s Consent to Jurisdiction (Docs. 7, 9). Based on the court's review of the record and the briefs of the parties, the court REVERSES and REMANDS the Commissioner's decision.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).[3]

To make this determination, the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011).

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?

---

[2]  Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[3]  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [the Listing of Impairments]?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?
An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The burden of proof rests on a claimant through Step Four. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). A claimant establishes a *prima facie* case of qualifying disability once they have carried the burden of proof from Step One through Step Four. At Step Five, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id*. at 1238-39. The RFC is what the claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence. *Id*. It may contain both exertional and nonexertional limitations. *Id*. at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant

---

[4] *McDaniel* is a supplemental security income (SSI) case. The same sequence applies to disability insurance benefits. Supplemental security income cases arising under Title XVI of the Social Security Act are appropriately cited as authority in Title II cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981); *Smith v. Comm'r of Soc. Sec.*, 486 F. App'x 874, 876 n.* (11th Cir. 2012) ("The definition of disability and the test used to determine whether a person has a disability is the same for claims seeking disability insurance benefits or supplemental security income.").

can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines ("grids") or call a vocational expert ("VE"). *Id.* at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Phillips*, 357 F.3d at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id.*

The court's review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Even if the evidence preponderates against the Commissioner's findings, [a reviewing court] must affirm if the decision reached is supported by substantial evidence."). A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings. . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal

4

conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## III.   ADMINISTRATIVE PROCEEDINGS

Plaintiff was thirty-five years old at the time of the hearing, and had completed tenth grade.  Tr. 46.  Following an administrative hearing, and employing the five-step process, the ALJ found at Step One that Plaintiff "has not engaged in substantial gainful activity since February 10, 2012, the alleged onset date[.]"  Tr. 24.  At Step Two, the ALJ found that Plaintiff suffers from the following severe impairments: "herpes simplex type II meningitis and migraines[.]"  Tr. 24.  At Step Three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]"  Tr. 27.  Next, the ALJ articulated Plaintiff's RFC as follows: "[T]he claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)."  Tr. 27.  Having consulted with a VE at the hearing, the ALJ concluded at Step Four that Plaintiff "is unable to perform any past relevant work[.]"  Tr. 30.  The ALJ, noting that Plaintiff was considered a "younger individual" on the alleged disability date with "limited" education, concluded that the "[t]ransferability of job skills [was] not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of 'not disabled,' whether or not the claimant has transferable job skills[.]"  Tr. 30.  Finally, at Step Five, and based upon the testimony of the VE, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are

jobs that exist in significant numbers in the national economy that the claimant can perform[.]" Tr. 30. The ALJ did not list other jobs that Plaintiff could perform, but instead concluded that Plaintiff was not disabled based upon Medical-Vocational Rule 201.25. Tr. 30-31. Accordingly, the ALJ determined that Plaintiff "has not been under a disability . . . from February 10, 2012, through the date of this decision[.]" Tr. 31.

## IV. PLAINTIFF'S CLAIMS

Plaintiff presents two arguments on appeal. First, Plaintiff argues "[t]he ALJ failed to provide adequate weight to the opinions of [Plaintiff's] treating physician[.]" Doc. 13 at 5-8. Second, Plaintiff argues "the ALJ failed to find [Plaintiff's] depression and anxiety as severe impairments[.]" *Id*. at 8-11.

## V. DISCUSSION

The undersigned turns first to address whether the ALJ provided adequate weight to the opinions of Plaintiff's treating physicians.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Good cause to discount the opinion of a treating

physician exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id.* at 1240–41.

Opinions from medical sources on some issues are not considered medical opinions because they are reserved for the Commissioner as "administrative findings that are dispositive of the case; i.e., [opinions] that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(e). Examples of these opinions include:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

SSR 96-5p at *2; *Hutchinson v. Astrue*, 408 F. App'x 324, 327 (11th Cir. 2011) (whether a claimant can hold a job is an administrative finding, not a medical opinion). While these opinions are not entitled to controlling weight, an ALJ must still take them into consideration. *See* SSR 96-5p, at *5 ("Medical sources often offer opinions about whether an individual who has applied for title II . . . disability benefits is 'disabled' or 'unable to

work[.]' . . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinion on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance."). In so doing, the ALJ may use the following criteria to determine how much weight to assign the opinion: (1) the examining relationship; (2) the treatment relationship, which includes the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) the supportability of the opinion through medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is offered by a specialist in the field; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c).

Here, in affording the opinions of Plaintiff's treating physicians "little weight," the ALJ stated:

> As for the opinion evidence, one of the claimant's treating neurologists, Hassan Kesserwani, MD, opined in an April 2012 treatment note that the claimant could not work due to daily headaches (Exhibit 8F/5-6). The claimant's primary neurologist, Sher M. Ghori, MD, also opined that, based on the frequency, duration, and severity of the claimant's headaches, she is precluded from maintaining any competitive employment on a sustained basis. Dr. Ghori more specifically opined that the claimant would miss approximately 30 days of work per month (everyday) due to her symptoms (Exhibit 17F). The undersigned accords both of these doctors' opinions little weight as they are inconsistent with the claimant's work history, which reveals that she worked with headaches of approximately the same level of frequency and intensity throughout 2010 and 2011 (Exhibits 3E; 16E; 2F; 3F; 4F; 10F and 11F). The doctors' opinions are also inconsistent with the claimant's admitted activities of daily living, including driving, shopping, reading, preparing meals, dressing and grooming herself, cleaning her house,

and managing her medications and appointments without special reminders or other assistance (HT and Exhibits 4E and 7E).

Tr. 29.

The undersigned concludes that Dr. Ghori's opinion that Plaintiff is precluded from maintaining competitive employment on a sustained basis is an administrative finding—not a medical opinion. *See Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 854 (11th Cir. 2013) (noting that "whether a claimant is disabled or unable to work is an issue reserved to the Commissioner as an administrative finding, and a medical source opinion on this issue is not a "medical opinion"); *Kelly v. Comm'r of Soc. Sec.,* 401 F. App'x 403, 407 (11th Cir. 2010) ("A doctor's opinion on a dispositive issue reserved for the Commissioner, such as whether the claimant is 'disabled' or 'unable to work,' is not considered a medical opinion and is not given any special significance, even if offered by a treating source, but will be taken into consideration."). Similarly, Dr. Kesserwani's opinion that Plaintiff cannot work due to her daily headaches is an administrative finding—not a medical opinion. *See id*. While these opinions are not entitled to "controlling weight" or given "special significance," the ALJ is still required to "evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5P, at *2-3. In so doing, the ALJ "must apply the applicable factors in 20 C.F.R. 404.1527(d) and 416.927(d)" to determine the appropriate weight to assign the opinions.[5] *Id*.

---

[5] When SSR 96-5p was published in 1996, 20 C.F.R. § 404.1527(d) listed the factors now set forth in § 404.1527(c). *Compare* 20 C.F.R. § 404.1527(d) (effective through July 31, 2006) *with* 20 C.F.R. §

Here, the ALJ's reasoning for assigning the opinions of Dr. Ghori and Dr. Kesserwani "little weight" is based upon a perceived lack of consistency with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4) (listing consistency with the record as a whole to be a factor for consideration when assigning weight to a medical opinion). In particular, the ALJ pointed to: (1) Plaintiff's ability to work prior to the alleged onset date despite experiencing headaches of the same frequency, intensity, and duration; and (2) her own reports of her daily activities. Tr. 29. The undersigned will examine each, in turn, to determine whether the ALJ's assignment of little weight to Plaintiff's treating physicians was in error.

*Plaintiff's Previous Work History*

The ALJ reasoned, in part, that the opinions of Plaintiff's treating physicians were entitled to little weight because "they are inconsistent with the claimant's work history, which reveals that she worked with headaches of approximately the same level of frequency and intensity throughout 2010 and 2011 (Exhibits 3E; 16E; 1F; 2F; 3F; 4F; 10F; and 11F)." Tr. 29. The ALJ's opinion states, in relevant part:

> While the claimant maintains that she quit work due to her impairments, the record reveals that the claimant's allegedly disabling impairments were present at approximately the same level and severity prior to her last day of work and alleged onset date. Treatment records indicate that the claimant has had a history of migraine headaches since she was a teenager[.] While her migraines may have significantly worsened since then, the intensity and frequency of her migraines has been the same since at least 2010. In her Headache Questionnaire, which she submitted in August 2013, she reported that she had been having headaches of the same type, severity, and frequency that she now alleges are disabling for approximately six years. She further

404.1527(c) (effective March 27, 2017).

reported that she had been to the emergency department approximately 15 to 20 times in the past three years. This is consistent with treatment records documenting frequent emergency department visits for migraines in 2010 and 2011 (Exhibits 5E [Headache Questionnaire]; 1F; 2F; 3F; 4F; 10F/42 and 11F).

The claimant's herpes simplex virus and secondary recurrent meningitis was also a preexisting condition, which, if anything, has lessened in severity since the alleged onset date. The claimant was initially diagnosed with meningitis in March 2011, which reoccurred in June 2011 (Exhibit 3F/2; 4F/2). Notably, the claimant continued working for Kelley Foods, a frozen food distributor, until February 2012 (Exhibits 2D; 3D; 4D; 3E and 16E). The fact that the claimant's allegedly disabling migraines and meningitis did not prevent her from working before strongly suggests that these impairments would not currently prevent work.

While the meningitis relapsed again in February 2012, there has not been another recurrence [ ] since (Exhibit 22F/4). Rather an oral prophylactic, Acyclovir, now effectively suppresses the herpes virus and meningitis (Exhibits 5F/2; 6F; 11F/18, 22 and 21F/3, 5, 7, 11). In light of the fact that migraine headaches and meningitis have some symptoms in common, the claimant and her treating physicians have continued to carefully monitor her for a recurrence of meningitis. Indeed, this concern likely attributed to her frequent emergency department visits, when she perhaps could have otherwise treated her migraine herself from home. However, her migraines have not been accompanied by any significant meningitis signs and all spinal taps have been negative (Exhibits 10F/20-21; 17F/3; 21F and 23F/7).

Tr. 28.[6]

---

[6] It is important to note that, although the symptoms of Plaintiff's meningitis and her migraines overlap, a lack of meningitis recurrence does not necessarily mean that Plaintiff no longer suffers from migraines. Indeed, the conditions can, and do, stand alone as evidenced by the fact that Plaintiff has experienced headaches for years prior to her diagnosis of meningitis. Further, it is virtually impossible to determine from the medical evidence whether Plaintiff's trips to the emergency room for migraine treatments were motivated by fear of a meningitis relapse or whether the headaches were of such a severity that required more than at-home therapy. Thus, to the extent that the ALJ is attempting to discount the severity of Plaintiff's migraines that resulted in outpatient treatment simply because he believes Plaintiff sought emergency care out of fear of meningitis relapse, such speculation is misplaced.

In reviewing the ALJ's assignment of little weight to Plaintiff's treating physicians, the undersigned is careful to not reweigh the evidence considered by the ALJ. In conducting this limited review, the undersigned particularly focuses on the evidence specifically cited by the ALJ to support his position—i.e., Exhibits 3E; 16E; 1F; 2F; 3F; 4F; 10F; and 11F—to determine whether substantial evidence supports the ALJ's conclusion. After a thorough review of those documents, and the record as a whole, the undersigned concludes that the ALJ's reasoning is not supported.

### *Plaintiff's Work History—Exhibits 3E & 16E*

From August 2010 through February 2012, Plaintiff worked as a retail packer for Kelley Foods. Tr. 168 (Exhs. 3E, 16E). There, Plaintiff's responsibilities included "moving and catching boxes weighing 6lbs-50lbs everyday," "entering jobs in [the] computer," and "standing on [her] feet 8-10 hours daily." Tr. 226. According to Plaintiff's report, she was unemployed for the first seven months of 2010. Tr. 168.

### *Plaintiff's 2010-2011 Medical History—Exhibits 1F; 2F; 3F; 4F; 10F; and 11F*

Plaintiff's 2010-2011 medical history indicates that she was hospitalized for approximately four days in February 2010 (during her unemployment) due to a migraine headache. Tr. 232-256 (Exh. 1F). During this hospitalization, Plaintiff reported that she "has had migraine headaches since she was 16 years old" and that she "usually has 2 or 3 a year" that "are easily relieved with Demerol and Phenergan." Tr. 235. However, Plaintiff reported to the emergency room after this particular headache "grew more intense" and failed to respond to her normal treatment regimen. Tr. 235. Plaintiff was treated,

improved, and was released on March 1, 2010, with instructions to follow up over the next few days. Tr. 233.

Plaintiff was hospitalized twice for approximately one week in duration while she was employed with Kelley Foods. One of those hospitalizations occurred in March 2011, Tr. 267-294 (Exh. 3F), and the other in June 2011, Tr. 295-319 (Exh. 4F). During the March hospitalization, Plaintiff reported experiencing "infrequent migraines," the last of which occurred a couple years prior. Tr. 269. Plaintiff was ultimately diagnosed with aseptic meningitis,[7] and Dr. Ghori, who treated Plaintiff during her hospitalization, ordered Plaintiff to not return to work for two weeks. Tr. 270. During the June hospitalization, Dr. Ghori noted that Plaintiff had experienced a weeklong history of intractable headaches. Tr. 296. After performing a spinal tap, Dr. Ghori diagnosed Plaintiff with septic/viral meningitis. Tr. 296.

During her employment with Kelley Foods, Plaintiff's medical records also indicate that she visited the emergency room on September 30, 2011, for treatment of a severe migraine. Tr. 462-469 (Exh. 10F). She was discharged on the same day. Tr. 463.

---

[7] Aseptic meningitis "describes a clinical syndrome characterized by meningeal inflammation not cause by an identifiable bacterial pathogen in the cerebrospinal fluid[.]" *Aseptic Meningitis and Viral Myelitis*, David N. Iran, US National Library of Medicine National Institutes of Health, https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC2728900/ (last visited August 23, 2017). "[M]ost patients with aseptic meningitis present with fever accompanied by complaints of headache, stiff neck, malaise, anorexia, and vomiting." *Id*. While there are many potential causes of aseptic meningitis, one cause is the use of non-sterodial anti-inflammatory drugs ("NSAIDS"), including aspirin, ibuprofen, and naproxen. *Id*. It may also be a result of the herpes type II simplex virus. *Viral Meningitis*, Meningitis Research Foundation, http://www.meningitis.org/disease-info/types-causes/viral-meningitis (last visited August 23, 2017).

Dr. Ghori, Plaintiff's primary treating neurologist, provides four follow-up notes regarding Plaintiff's treatment between July 8, 2011, and December 30, 2011. Tr. 470-77 (Exh. 11F). In July 2011, Dr. Ghori referenced Plaintiff's June 2011 hospitalization, and noted that Plaintiff was doing better overall, and would hopefully be ready to return to work "in a week or so." Tr. 470. In August 2011, Dr. Ghori noted that Plaintiff reported having more headaches over the past few days, one being quite severe. Tr. 472. Although a recurrence of meningitis was possible, Dr. Ghori indicated that she believed Plaintiff's condition was likely a migraine. Tr. 472. In September 2011, Dr. Ghori saw Plaintiff for a migraine attack.[8] Tr. 474. By December 2011, Dr. Ghori noted that Plaintiff's headaches were frequent, occurring three to four times per week. Tr. 476. Notably, Plaintiff's employment with Kelley Foods ended approximately two months later.

*Plaintiff's Medical History Post Alleged Onset Date*

After February 10, 2012, Plaintiff's alleged onset date, Plaintiff was admitted to the hospital on three occasions. Plaintiff's first visit occurred on February 13, 2012. Tr. 320-348. During that visit, Plaintiff reported that her migraines were "different" than those she had previously experienced, despite compliance with her medication. Tr. 321, 323. Plaintiff was treated, her condition improved, and she was discharged four days later. Tr. 321. Plaintiff returned to the hospital again on February 20, 2012. Tr. 349-376. During that hospitalization, it was determined that Plaintiff was experiencing a relapse of herpes

---

[8] This treatment note from Dr. Ghori reflects Plaintiff's outpatient emergency room visit referenced in the previous paragraph.

type II meningitis. Tr. 350. Plaintiff was discharged on February 24, 2012. Tr. 350. Plaintiff was admitted a third time to the hospital for treatment from August 15, 2014, through August 22, 2014. Tr. 654. It does not appear that the August 2014 visit was linked to a relapse of the meningitis, but was instead the result of a migraine headache. Tr. 654. Plaintiff had at least thirteen additional emergency room visits for migraine headaches, which were treated on an outpatient basis between November 2012 and February 2015. *See* Tr. 420-1053 (reflecting visits on November 12, 2012, Tr. 494; March 12, 2013, Tr. 444; March 15, 2013, Tr. 433; July 18, 2013, Tr. 420; July 31, 2013, Tr. 492; November 12, 2013, Tr. 614; May 15, 2014, Tr. 598; February 14, 2014, Tr. 618; June 3, 2014, Tr. 596; August 8, 2014, Tr. 587; January 13, 2015, Tr. 1141; January 21, 2015, Tr. 1110; and February 3, 2015, Tr. 1053).

During this time, Plaintiff continued to see Dr. Ghori. Dr. Ghori provides seven follow-up notes regarding Plaintiff's treatment between February 20, 2012, and November 12, 2013. After Plaintiff's February 20, 2012, hospitalization, Dr. Ghori noted that "Plaintiff is not feeling well[,]" and that while her headaches are better, they are not gone. Tr. 480. She further noted that Plaintiff was not ready to return to work. Tr. 480. Then, on April 3, 2012, Dr. Ghori noted improvement from Plaintiff, stating that she was feeling well overall. Tr. 482. On January 7, 2013, Plaintiff returned to Dr. Ghori. Tr. 484-85. At that visit, Plaintiff reported that she was experiencing headaches on a daily basis and "bad" migraines three times per week. Tr. 484. Dr. Ghori noted that "[a]ll Plaintiff can do [is] lay and sleep." Tr. 484. Two months later, on March 20, 2013, Dr. Ghori saw Plaintiff,

noting that Plaintiff had experienced two bad migraines since her last visit; had visited the emergency room twice; and was experiencing chronic daily headaches, at least three of which were "really bad." Tr. 484. Dr. Ghori again noted that Plaintiff can only lay and sleep. Tr. 484. Three months later, on June 19, 2013, Plaintiff returned to Dr. Ghori and reported that her headaches were increasing in number and intensity, some of which were lasting the entire day. Tr. 488. Plaintiff also reported that the increase in frequency and intensity had occurred over the past month or last few weeks. Tr. 488. On July 31, 2013, Plaintiff followed-up with Dr. Ghori after a visit to the emergency room. Tr. 490-91. Plaintiff reported that her headaches were "quite frequent," with several occurring each week. Tr. 490. Finally, on November 12, 2013, Plaintiff saw Dr. Ghori again. Tr. 527-28. At that visit, Plaintiff complained that she had been experiencing a headache for the last two days, which was accompanied by nausea and vomiting. Tr. 527. Despite trying her "usual out patient treatment," Dr. Ghori reported that Plaintiff "look[ed] miserable." Tr. 527.

Treatment notes from Dr. Kesserwani, a neurologist who treated Plaintiff from March 2012 through October 2012, indicate findings similar to those of Dr. Ghori. On March 6, 2012, Dr. Kesserwani noted that Plaintiff "has chronic migraine, almost daily," and has failed five migraine preventives. Tr. 398-99. Dr. Kesserwani recommended that Plaintiff receive bilateral occipital and supraorbital nerve blocks. Tr. 399. That procedure was performed on March 7, 2012. Tr. 395-97. On April 4, 2012, Plaintiff returned to Dr. Kesserwani, who diagnosed Plaintiff with an intractable migraine. Tr. 393. He noted that

the nerve blocks performed in March were helpful, but only lasted a week. Tr. 393. He further opined that Plaintiff could not work, and provided Plaintiff with a letter, dated April 6, 2012, stating that Plaintiff was unable to work, and placing her on temporary disability for at least eight weeks. Tr. 393-94. He also stated that Plaintiff was experiencing disabling headaches thirty days per month, and that he would attempt Botox as his next step in Plaintiff's treatment regimen. Tr. 394. Plaintiff received the Botox procedure on May 4, 2012. Tr. 392. The last treatment note from Dr. Kesserwani was entered on November 13, 2012. Tr. 390. In that note, Dr. Kesserwani stated that Plaintiff's headaches persist, almost daily. Tr. 390. He noted that Plaintiff experiences "sharp shooting pain in the back of the head," and is bedridden twice a day. Tr. 390. He further noted that she has chronic migraine, has failed at least five preventives including Botox, and that she saw a pain specialist, who prescribed Duragesic, which did not help. Tr. 390. Dr. Kesserwani stated that, having exhausted his treatment options for Plaintiff, her "best option would be to go to another headache specialist." Tr. 390.

### *Comparing the Medical Evidence*

With the aforementioned evidence before him, the ALJ determined that Dr. Ghori's and Dr. Kesserwani's opinions that Plaintiff could not work were entitled to little weight because Plaintiff was able to work during 2010 and 2011 with migraines of the same intensity, frequency, and duration. As addressed in detail above, Plaintiff's medical records from 2010-2011 indicate that she was admitted to the hospital in February 2010 (prior to her employment with Kelley Foods), March 2011, and June 2011 for migraines.

She had an additional outpatient hospital visit during her employment in September 2011 for migraine. Notably, Plaintiff's first and second hospital admissions were thirteen months apart. Plaintiff's second and third hospital admissions were three months apart, followed by an outpatient emergency room visit that occurred three months later. Five months after her outpatient treatment, Plaintiff's employment with Kelley Foods ended.

After Plaintiff's alleged onset date of February 10, 2012, Plaintiff had a four-day hospital admission on February 13, 2012, followed by another four-day admission one-week later on February 20, 2012. Plaintiff received emergency treatment on an outpatient basis on November 12, 2012; March 12, 2013; March 15, 2013; July 18, 2013; July 31, 2013; November 12, 2013; May 15, 2014; February 14, 2014; June 3, 2014; August 8, 2014; January 13, 2015; January 21, 2015; and February 3, 2015.

While there clearly appears to be an increase in the frequency of Plaintiff's emergency room visits due to headache distress, it is more concerning to the undersigned that the ALJ ignores the progression of Plaintiff's migraines from 2010 through the onset date as reported by Plaintiff and by Dr. Ghori. In her first visit to the emergency room in February 2010, Plaintiff reported that she had previously experienced two or three migraines per year, and that they were treatable using at home therapies. By December 2011—two months before the alleged onset date—Dr. Ghori noted that Plaintiff was having migraines three to four times per week. Similarly, by the time Plaintiff was under the care of Dr. Kesserwani in 2012, Plaintiff was experiencing "chronic migraine" headaches, was bedridden twice a day, and had failed at least five migraine preventives.

By January 2013, Plaintiff reported having headaches on a daily basis and bad migraines three times per week. Again, in June 2013, Plaintiff reported to Dr. Ghori that she is having increasing numbers of headaches. The increase in intensity, frequency, and duration of Plaintiff's headaches is also reflected in Dr. Ghori's assessment of Plaintiff's ability to work. Indeed, in July 2011, Dr. Ghori was hopeful that Plaintiff could return to work "in a week or so." However, by December 2013, Dr. Ghori opined that Plaintiff would miss thirty days of work due to her symptoms, and could not hold meaningful employment. Independently, Dr. Kesserwani opined in April 2012 that Plaintiff could not work. This obvious progression of Plaintiff's migraines can be seen in just a cursory glance of the treating physicians' notes.

Nowhere in the ALJ's opinion does he address this evidence. Instead, he summarily concludes that Plaintiff's migraines were similar before and after the alleged onset date and during Plaintiff's previous employment, while presumably overlooking or disregarding the progression of Plaintiff's condition as reported by Dr. Ghori and Dr. Kesserwani. That being so, the undersigned finds that there is not substantial evidence to support the ALJ's reasoning for assigning Plaintiff's treating physicians' opinions little weight, and, in fact, the medical evidence contradicts such reasoning.

*Plaintiff's Admitted Activities*

Next, the ALJ reasons, in part, that the opinions of the treating physicians should be afforded little weight because those opinions are inconsistent with Plaintiff's admitted

activities of daily living. The ALJ points to the hearing transcript for support, along with Exhibits 4E and 7E.[9]

In February 2015, Plaintiff testified at the hearing before the ALJ that she regularly drives a car; that she bathes and dresses herself; that she can wash dishes and load the dishwasher; that she can wash clothes "from time to time"; that she sends her mother to grocery shop because that activity is "too stressful"; and that she does not cook, tend a yard, or garden. Tr. 53-54. Plaintiff further testified that she has weekly migraines lasting anywhere from two to three days, and sometimes the entire week. Tr. 56. Plaintiff stated that, if she does not end up seeking treatment at the hospital for her migraines, she will "lay down in a dark, qui[et] room[,]" and that she is unable to do anything around the house

---

[9] In the paragraph in which the ALJ assigned little weight to the opinions of Plaintiff's treating physicians, the ALJ did not explicitly refer to Plaintiff's statement in her Headache Questionnaire, completed in August 2013, that she has experienced headaches of the same intensity, frequency, and duration since 2007. *See* Tr. 184-86 (Exh. 5E). Thus, it is unclear whether the ALJ considered this statement in determining that the opinions were afforded little weight, or, whether the ALJ relied solely upon the evidence he cited within that paragraph—i.e., the hearing transcript and Exhibits 4E and 7E (the reports from Plaintiff's former husband and herself)—to make his assessment.

The undersigned observes that Plaintiff's previous statement could indicate her ability to maintain employment. This is because if Plaintiff's headaches have not increased in duration, frequency, or intensity since the time she was employed, it stands to reason that she could hold employment now. However, just because Plaintiff's headaches have not changed in those areas does not mean that they have not changed in others. Indeed, the undersigned notes that Plaintiff's February 2010 hospital visit reflects that she sought emergency treatment because her normal therapy course was not relieving her symptoms. After that time, Plaintiff's medical evidence shows that multiple hospital visits were required to treat her migraines. Thus, it also stands to reason that even if the headaches have been consistent in their frequency, duration, and intensity, they have changed in other areas and have become more debilitating and non-responsive to previous courses of treatment. Such a change could impact Plaintiff's ability to hold employment. Thus, to the extent the ALJ relied upon Plaintiff's own statement in her Headache Questionnaire to assign little weight to her treating physicians' opinions, the undersigned concludes that such reliance is, at the least, not properly discussed, and, at the most, in error.

during those times other than use the restroom.  Tr. 56.  Plaintiff also testified that the migraines have worsened since the time she stopped working.  Tr. 57.

Exhibit 4E, referenced by the ALJ, is a Third-Party Function Report from Plaintiff's husband at the time, which was completed on August 12, 2013.  Tr. 176-183.  In that report, Mr. Kidd states that Plaintiff would "try to do a little laundry & house cleaning but usually she is resting."  Tr. 176.  He also states that Plaintiff will sometimes cook, but that she cannot be on her feet for long periods of time, or get hot.  Tr. 177, 179.  Mr. Kidd states that Plaintiff shops for groceries, supplies, and clothes "once a week or twice every two weeks."  Tr. 179.  He reports that Plaintiff can read and watch television on a daily basis.  Tr. 180.  Exhibit 7E, referenced by the ALJ, is a Function Report completed by Plaintiff on August 12, 2013.  Tr. 189-196.  It is remarkably similar to Mr. Kidd's report of Plaintiff's functional abilities, and differs in no meaningful way.

The undersigned does not find that Plaintiff's admitted activities supports assigning little weight to the treating physicians' opinions.  While it may be true that Plaintiff can perform some daily activities such as bathing, cleaning and cooking, shopping from time to time, and driving a vehicle, this does not equate to Plaintiff's ability to hold employment, particularly considering the nature and presentation of migraines.  *See Roberson v. Colvin*, 6:12-cv-3585-AKK, 2014 WL 3810236, at * 5 (N.D. Ala. July 30, 2014) (noting that the medical expert consulted by the ALJ testified that "when you have a migraine headache it really totally incapacitates someone . . . [b]ut when you don't have a migraine headache then you're okay.").  Neither Plaintiff's self-function report nor Mr. Kidd's third-party

assessment report contradict Plaintiff's medical records regarding the frequency, intensity, or duration of her migraines. Thus, the ALJ's reasoning for affording Plaintiff's treating physicians' opinions little weight is not supported by the record.[10]

*Summary*

Upon remand, the ALJ must consider the applicable factors listed in § 404.1527(c) and 416.927(c) in determining what weight to assign the opinions of Dr. Ghori and Dr. Kesserwani. SSR 96-5p at *3. As a review, those factors include: (1) the examining relationship; (2) the treatment relationship, which includes the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) the supportability of the opinion through medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is offered by a specialist in the field; and (6) any other factors brought to the attention of the Commissioner.

Other than his concerns regarding the opinions' consistency with the record, it does not appear that the ALJ discussed any of the above factors when making a determination that the opinions of Dr. Ghori and Dr. Kesserwani were entitled to little weight. Importantly, it should be noted that Plaintiff saw both physicians, who appear to be specialists in their field, on multiple occasions and had an established treatment

---

[10] Further, where, as here, "an ALJ has found that a claimant's migraine headaches are severe, meaning that they significantly limit her ability to do basic work activities, 20 C.F.R. 416.920(c), the ALJ must also 'assess properly what those significant limitations were' by weighing 'how frequently the . . . migraine headaches occurred; how severe [she] thought they were; and how long [she] thought they lasted.'" *Wagner v. Colvin*, Case No. 2:16-cv-720-TMP, 2017 WL 3087489, at *7 (N.D. Ala. July 20, 2017) (quoting *Reis v. Astrue*, No. 8:11-CV-2027-T-TGW, 2012 WL 3231092, at *4 (M.D. Fla. Aug. 6, 2012)).

relationship with both. Indeed, at the time she expressed her opinion as to Plaintiff's ability to engage in the workforce, Dr. Ghori had treated Plaintiff for approximately three years. Tr. 525. At the time he opined that Plaintiff could not work, Dr. Kesserwani had seen Plaintiff twice. Tr. 393-94, 398. However, he continued to treat Plaintiff until October 2012, maintaining the severity of Plaintiff's condition throughout his notes and stating that he had exhausted his treatment options for Plaintiff. Further, the undersigned notes that both physicians' opinions do not contradict their own extensive treatment notes, and reflect an aggressive treatment course—i.e., hospitalization, Botox injections, referrals to specialists, and attempts at multiple migraine preventives. Although Plaintiff's objective medical evidence—i.e., MRIs and other medical imaging—did not indicate any particular abnormality, such is not an unusual or detrimental conclusion. *Thompson v. Barnhart*, 492 F. Supp. 2d 1206, 1215 (S.D. Ala. 2007) (noting that "neither the [SSA] nor the federal courts require that an impairment, including migraines, be proven through objective clinical findings"). Finally, the undersigned notes that the longitudinal record of Plaintiff's migraines should be considered, as such is indicative of the severity of Plaintiff's impairment. *See Wagner*, 2017 WL 3087498, at *5. These considerations, and others, are important for the ALJ to discuss when determining the proper weight to assign a non-medical opinion.

In summary, because the opinions offered by Dr. Ghori and Dr. Kesserwani are not considered medical opinions, they are not entitled to controlling weight or special significance. However, the ALJ must still consider those opinions and provide reasoning

as to why he assigns a particular weight to the opinion. That reasoning must make sense, and must be supported by the record. It is possible that, upon remand, the ALJ will once again determine that the opinions are to be afforded little weight. Such a conclusion would not be in error, so long as the reasoning behind that assignment is supported by the record. Accordingly, the case is due to be reversed and remanded to the ALJ for further consideration. *See generally Lindsey v. Colvin*, 208 F. Supp. 3d 1239 (N.D. Ala. 2016) (holding that the ALJ's findings—"(1) that the intensity and duration of [the plaintiff's] headaches had not increased[,] and (2) that 'despite her headaches, which she reported she had for years, [Ms. Lindsey] had continued to work for a significant period of time'—are not supported by substantial evidence.").

The undersigned will not address Plaintiff's second argument, as the first is dispositive of the case.

## VI. CONCLUSION

The court has carefully and independently reviewed the record and concludes that, for the reasons given above, the decision of the Commissioner is REVERSED and REMANDED. A separate judgment will issue.

Done this 28th day of August, 2017.

/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE